**STATE OF NEW YORK et al. v. UNITED STATES et al.**

**Civ. 3832.**

United States District Court
N. D. New York.

April 20, 1951.

———◆———

Nathaniel L. Goldstein, Atty. Gen. State of New York, Samuel A. Hirshowitz, Asst. Atty. Gen., for petitioner, State of New York.

Sherman C. Ward, Acting Counsel Public Service Commission, Albany, N. Y. Joseph J. Doran, Asst. Counsel, Rochester, N. Y., Samuel R. Madison, Sp. Atty., Albany, N. Y., for petitioner, Public Service Commission.

William D. McFarlane Sp.Asst. to Atty. Gen., Irving J. Higbee, U. S. Atty., Syracuse, N. Y., for defendant, United States.

J. Stanley Payne, Asst. Chief Counsel, Interstate Commerce Commission, Washington, D. C., for intervenor-defendant, Interstate Commerce Commission.

Edward R. Brumley, New York City, General Counsel, New York, New Haven & Hartford R. R., for intervenor-defendant, New York, New Haven & Hartford R. Co.

Emanuel Schwartz, New York City, for Town of Pelham.

Before CLARK, Circuit Judge, SMITH, District Judge, and BRENNAN, Chief Judge.

BRENNAN, Chief Judge.

This proceeding challenges the validity of a report of the Interstate Commerce Commission, dated October 9, 1950, and an order entered thereon on December 12, 1950.

For convenience the Public Service Commission of the State of New York will be referred to as the "P.S.C.", the Interstate Commerce Commission as the "I.C.C.", and the New York, New Haven and Hartford Railroad Company as the "New Haven".

The order of the I.C.C. sought to be annulled requires the New Haven to increase its New York intrastate commutation fares so that they will become uniform with its interstate commutation fares for the same distances. The order complained of became effective February 1, 1951. An application to this Court for a temporary injunction restraining the enforcement of the order was denied upon the condition that the excess fares collected by the New Haven pending the final determination of this proceeding be impounded in such a manner that they could be returned to the commuters in the event that the order was finally determined to be invalid.

The New Haven is an interstate railroad carrier providing regular passenger and freight service in the states of New York, Connecticut, Rhode Island and Massachusetts. Generally speaking, its principal passenger terminals are Boston on the north and New York City on the south. Its passenger service produces about 41% of its total operating revenues and is accountable for about 48% of its operating expenses. Its commutation service is a substantial item of both revenue and expense in its total operation.

Geographically the order involves commuters' transportation rates on the New Haven line over a distance of about twenty-six miles from the Grand Central Station at New York City. It applies to nine stations wholly within the State of New York, the most distant from the Grand Central terminal being that for the City of Port Chester.

The order in question is referred to in the proceeding as a Section 13 order and the authority therefor is found in Section 13(3) and (4) of the Interstate Commerce Act, 49 U.S.C.A. § 13(3) and (4).[1] The

1. "(3) Whenever in any investigation under the provisions of this chapter, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by

controversy involves a subject matter of which the State of New York has the primary jurisdiction, and the I.C.C. has jurisdiction only for the purpose of removing discriminations referred to in the statute. There is, therefore, underlying this proceeding the question of the powers of the federal and state agencies and the general policy of comity between them. With these facts in mind it is deemed advisable to summarize the history of the rate-making of commutation fares as applicable here.

Since 1925 commutation fares have been on a uniform basis. This result was obtained after an investigation by the I.C.C. and regulatory authorities in the States of Connecticut, New York, Massachusetts and Rhode Island (101 I.C.C. 703). This basis so far as pertinent here applied to a 60-ride ticket, good for thirty days from its date and otherwise unrestricted as to its use. Such uniformity existed except for a period from February 10, 1942 to May 14, 1943, during which time such fares were increased 10% following the Commission's order of January 23, 1942. About September, 1947, in a proceeding before the I.C.C. (269 I.C.C. 87), a 46-ride

trip restricted commutation ticket, not valid on Saturdays, Sundays or holidays, was authorized. Fare increases were ordered in the 60-trip unrestricted and 46-trip restricted commutation tickets of 25% and 15% respectively. After the filing of the required tariffs by the New Haven with the P.S.C. that body suspended the operation thereof, and instituted an investigation. On March 6, 1948, the New Haven filed its petition under Section 13 of the Act, and requested that the I.C.C. make effective for intrastate traffic within the State of New York the interstate commutation fares found reasonable and established between stations in Connecticut and stations in New York (269 I.C.C. 87). On June 2, 1948, the P.S.C., by decision, cancelled the New Haven's intrastate tariff filed in September, 1947. The New Haven requested the P.S.C. to re-open the case and receive additional evidence. Hearings were held, and the P.S.C. by interim decision found the New Haven was entitled to temporary increases of 18% and 6% on the unrestricted and restricted commutation tickets respectively. Such interim rates were established for a limited period, but have been extended by order of the P.S.C. and they are now in

authority of any State, the commission, before proceeding to hear and dispose of such issue, shall cause the State or States interested to be notified of the proceeding. The commission may confer with the authorities of any State having regulatory jurisdiction over the class of persons and corporations subject to this chapter or chapter 12 of this title with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such State bodies and of the commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such State regulating bodies on any matters wherein the commission is empowered to act and where the rate-making authority of a State is or may be affected by the action taken by the commission. The commission is also authorized to avail itself of the cooperation, services, records, and facilities of such State authorities in the enforcement of any provision of this chapter or chapter 12 of this title.

"(4) Whenever in any such investigation the commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any State or the decision or order of any State authority to the contrary notwithstanding."

force so far as the P.S.C. is concerned, although no final decision has been rendered. The I.C.C., after adjourning its hearings to permit the P.S.C. to complete its investigation, resumed its hearings under the Section 13 petition, which was amended to put in issue the interim rates above referred to, and the P.S.C. took part therein. The hearings involved the taking of a considerable amount of testimony and the consideration of several exhibits. A cost study was prepared by the New Haven and submitted to the P.S.C. and to the I.C.C. in the proceedings under discussion.

On October 9, 1950, the I.C.C. rendered its decision, finding in substance that the monthly commutation fares imposed by the P.S.C. for intrastate travel between stations on the New Haven line within the State of New York cause, and unless increased by 25% in connection with the unrestricted tickets and 15% in connection with the restricted tickets over the fares in effect on July 8, 1949, will continue to cause undue and unreasonable advantage to and preference of persons and localities in intrastate commerce in the State of New York, and undue and unreasonable disadvantage and prejudice to persons and localities in interstate commerce between stations in the States of Connecticut and New York, and undue, unreasonable and unjust discrimination against interstate commerce; all in violation of Paragraph 4 of Section 13 of the Interstate Commerce Act. The P.S.C. on November 10, 1950, filed with the I.C.C. its petition for reconsideration of its decision. The petition was denied on December 12, 1950, and the I.C.C. issued its order directing the New Haven to establish the fares above described on or before February 1, 1951. This action instituted December 22, 1950, followed.

There seems to be no dispute between the parties as to the power afforded the I.C.C. by the statute to fix interstate rates to remove discriminations against persons or localities and discriminations against interstate commerce, provided that either or both such discriminations are found to exist as a fact; such findings having a basis in substantial evidence. The question here resolves itself to a determination as to whether or not the I.C.C. made the requisite clear findings of fact to support the order, and whether such findings have a substantial basis in the evidence.

We pass logically to a consideration of the general principles afforded by the statutes and judicial precedents which serve as a guide to our determination. The parties are not in conflict as to such principles, but as is usual in this type of case, it is their application to the particular facts of the case which is the real crux of the controversy. Only brief reference then will be made thereto.

■■ As stated above, the authority of the I.C.C. is based upon the provisions of the Interstate Commerce Act, Sec. 13(3) and (4), 49 U.S.C.A. § 13(3) and (4). Such authority resulting as here in the nullification of the rates prescribed by the P.S.C. must be based upon " * * * clear findings, supported by evidence, of each element essential to the exercise of that power by the Commission." State of North Carolina v. U. S., 325 U.S. 507, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760. That this Court will not weigh the evidence and that its function is limited is consistently recognized. State of Florida v. U. S., 292 U.S. 1 at page 12, 54 S.Ct. 603, 78 L.Ed. 1077. The Court's judgment is not to be substituted for that of the Commission.

■ The discrimination found here against the Connecticut residents involves the relation of the interstate and intrastate rates to each other. The discrimination found against interstate commerce involves the relation of rates to income. State of Florida v. U. S., 282 U.S. 194 at page 214, 51 S.Ct. 119, 75 L.Ed. 291. Under either or both findings the I.C.C. must determine that the interstate rates are reasonable. Georgia Public Service Comm. v. U. S., 283 U.S. 765 at page 770, 51 S.Ct. 619, 75 L.Ed. 1397. The same case, however, is authority also for the holding that rates found to be reasonable need to be reconsidered in the absence of a showing of a change of conditions.

With the above facts and principles in mind an approach is made to an analysis of

the contentions of the litigants and a legal appraisal thereof in the light of the facts disclosed in the record.

The attacks made upon the Commission's findings come substantially to these points: a general contention of vagueness and lack of specific content in the findings as a whole; an attack upon the finding of similarity of the service rendered the New York and Connecticut commuters; and an attack upon three specific details relating to revenue and expense, viz.: the charge made for the Harlem tolls expense payable by the New Haven to the New York Central; the failure of the New Haven to allocate as revenue the receipts of Grand Central's rentals above ground, and the use of the "group method" of ascertaining costs as against the "train by train" method.

■ As to the general contention of vagueness in the findings, it is evident that some findings do tend to generalities, and that improvement thereon could be made. Experience indicates that to exert pressure for such strivings toward perfection usually results in a piling on of more words without essential change in substance. The criticism loses its force when the report is read as a whole. It shows without doubt what the Commission thought and did, and thereby the real function of findings is served.

The finding as to the similarity of service seems to be based upon evidence that appears to be substantially undisputed. Interstate and intrastate commuters make use of the same rails and terminals in their journey, but it is clear, and indeed conceded, that the intrastate equipment is not only different in detail but older and more antiquated; much of the controversy turns upon that fact. The intrastate commuters generally travel in multiple unit trains making local stops within the state. The coaches are not air-conditioned; have a seating capacity of 120 passengers and have a seating arrangement whereby three passengers occupy the seat on one side of the aisle and two on the other. The interstate passengers generally travel in air-conditioned coaches, having a smaller seating capacity. Generally local stops

are not made within the State of New York. Eighty-one per cent of such commuters ride in such trains, while eighteen and nine-tenths per cent ride with the intrastate commuters in the multiple unit trains. The report of the I. C. C. finds that the difference in the quality and value of the service as between the respective hauls is recognized in the commutation rates, both interstate and intrastate, except in New York. Nevertheless, it declined to hold the discrimination in rates, which it found, offset by these differences in type of service rendered.

■ The petitioners' point as to the service rendered comes to this: that since the equipment used by intrastate commuters is so poor, aged and outworn, the New Haven should, therefore, give a reduction in the fare charged. There is no contention that the service is inadequate, and there is no particular claim of untidiness, inconvenience or discomfort. The P. S. C. seems to pay no attention to the peculiarities and extra difficulty of the New York commuter traffic, notable that it must be taken care of quickly at the two peaks—incoming in the morning and outgoing at night. The need of having available the personnel, rolling stock and other equipment to take care of unusual traffic at two periods of the day, remaining substantially idle otherwise, presents questions of costs, as well as of executive management, not faced by petitioners. It is not shown that this ecomomic burden could be met, or could be better met, than by the kind of disposition of facilities actually made. Moreover, the practical inconvenience to the commuters was not convincingly shown. It would seem fairly obvious that the cars with the three-two seating arrangement were more desirable, from the practical as well as economic standpoint, for the kind of traffic than would cars having a double or single seating arrangement. No one would consider the use of the latter type of cars to handle Manhattan's subway traffic, which is comparable to the intrastate commuters traffic on the New Haven. The objections seem to come down to injuries to the esthetic sen-

sibilities of the commuters, save perhaps as to the absence of air-conditioning which is hardly necessary in the short runs involved. In any event, all of this should be made the subject of a direct appeal for adequate service by the P. S. C. rather than a lowering of rates.

■■ When similarity exists is a question of fact. The term denotes a general likeness, an approximation, something less than absolute identity. Its existence is determined by the facts as applied to railroad transportation, and as laymen we would hesitate to reverse a finding made by an expert body whose experience with the use and meaning of the term lends added weight to its findings.

Each of the three remaining items, to-wit, Harlem tolls expense, Grand Central Terminal expenses, and the "group method" of ascertaining costs as against the "train by train" method is in fact involved as a part of the accounting methods used in determining costs. In the cost study before the I. C. C. the New Haven charged the New York commutation service approximately $50,000 as an expense for its use of the Grand Central Terminal. No credit was given for the rents received from structures erected on the street level and used for non-operating purposes. The P. S. C. claims that there should be deducted or credited to the expense item about $24,000, on account of such ground rents. The Harlem tolls expense is an item payable under an agreement made in 1848 for use by the New York Central of certain trackage owned by the New York and Harlem Railroad. The commutation service of the New Haven travels over such trackage, and the cost study charges about $40,000 per month as an expense of commutation service. The P. S. C. claims it is overstated by about $12,000. In its cost study the New Haven used the "group method" of ascertaining costs. Same is based upon the cost for passenger mile on all trains studied. The P. S. C. reassembled such data on a "train by train" basis, and urges that it results in a decrease in the cost of the intrastate commutation service by about $24,000, the computations on all three items being upon a monthly basis.

■ The above matters are essentially matters of accounting, and are peculiarly within the province of the expert rate-making bodies. That the P. S. C. and the I. C. C. disagreed as to these items is not justification for this Court to constitute itself as expert in accounting methods. To do so would in effect be to transfer the rate-making power from the state and federal agencies, created by law, to the courts, which the appellate courts have many times stated may not be done. Such items as density of traffic, train loads, allocations of revenue and expense are all problems, involved in the above items. If such items have been considered and evaluated by the I. C. C. and applied in accordance with the principles of law, its conclusion must be final.

It affirmatively appears in the report that such items were in fact considered by the I. C. C. Some four typewritten pages of the report are devoted to these items. Briefly stated, the I. C. C. found that petitioners' contention that the trackage or Harlem tolls expense should be based on a cost-sharing basis instead of the actual contract basis was rejected, and the method appearing in the cost study "* * * is reasonably associated with the elements which occasioned such costs."

■ The expense to the New York Central was settled by contract with the New Haven in 1848 and implemented by arbitration settling the rates in 1861. At this late day no court can certainly venture, in an indirect proceeding, to say that the intercompany arrangements standing for one hundred years are to be brushed aside. So, the New Haven must now pay the charge in any event; the only question for us is how to apportion it fairly among different commuter groups or other patrons of the road. Hence, in fixing rates for the New York commuters there should be a proper allocation of a charge for the Harlem line tolls, and the issue comes down to a dispute as to the proper railroading method, whether on the basis of allocated costs per train or passenger miles of use.

The latter, which is the one used by the Road, would seem quite reasonable, or at least as reasonable as the former, claimed by the New York Commission. Certainly we can not reject it as legally unsound.

The question of the Grand Central area rents is perhaps a little more difficult. But that is because it is an even more technical question, rather than that we have the more basis for setting aside the professional view which is brought to us. The problem is an interesting one for railroad accountants. Of course, the land and buildings in the Grand Central area are most valuable, and the New Haven road receives a portion of the return of this land increment under its arrangements with the New York Central. It does not allocate any of this on its rate-making or specifically in computing the New York commuting rates in issue. It does employ the funds upon its fixed charges account, thus using the receipts to pay such necessary obligations as interest on bonds, etc. Fixed charges existing, it is obviously necessary that funds for their payment be reserved; if therefore a portion of the rentals are to be allocated to income in fixing the New York commuter rates, then there must be added a proper charge as a contribution to the payment of these obligations. Petitioners do not present anything on this, and as it stands, we think we have no basis for readjusting these charges.

The contention that the study should follow the "train by train" method rather than the "group" method is in substance rejected by the statement that such a method credits commutation service on the heavily patronized peak-hour trains, thereby obtaining the benefits of density without charging the service with the higher cost occasioned by such density. The report summarized the plaintiff's contentions in regard to the items of cost study, and states that applying same in a conservative aspect the New Haven's costs can in no event be said to be overstated by more than $42,000, and that with such favorable treatment, the intrastate commutation fares in New York are noncompensatory to maintain the interstate system of the New Haven. The importance

of this statement, which does appear conservative, lies in its demonstration that petitioners must succeed on practically every point to make a convincing showing of the need of injunctive relief; success on one or even two of the accounting issues will not justify the overturning of the order of the I.C.C. Since we are not convinced of the showing on any one of the points, we are constrained to find against the petitioners.

The plaintiff leans heavily upon the case of North Carolina v. U. S., supra, as authority for its contentions. The order in that case was state-wide in its scope and affected rail carriers who were already operating at an unusual profit. The court held there that a single finding that interstate passengers paid a higher fare than intrastate passengers for the same facilities was inadequate to support an order nullifying state-authorized rates upon a finding of prejudice to interstate passengers. It held that a reliance upon the existence of a disparity between the interstate and intrastate rates, in the absence of a finding that the intrastate rate was less than compensatory, was insufficient to sustain an order nullifying state-authorized rates upon a finding of prejudice to interstate commerce. Here we have findings that the intrastate rate is less than compensatory. We also have findings as to relationship of cummutation traffic to the total operation. We have a finding of reasonableness of the interstate rates which implies a correct percentage allocation of commutation revenue and expense. We have a finding as to the deficit in operations; all of which would seem to satisfy the deficiency found to exist in the North Carolina case. Substantial evidence to support such findings is clearly in the record, and the finding of discrimination as to interstate commerce is legally justified.

Since discrimination against interstate commerce is sufficient to sustain the order, we need not consider the further question as to the lawfulness of the order insofar as it finds discrimination between localities and between persons. It is sufficient to say that the findings made by the I. C. C. as they apply to discrimination against

interstate commerce are adopted as the findings of this Court.

We conclude that the Court has jurisdiction of the parties and the subject matter; that the order of the I. C. C. be affirmed; and that the complaint be dismissed.