**WHEELING–PITTSBURGH STEEL CORPORATION, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

The Chesapeake and Ohio Railway Company, National Association of Regulatory Utility Commissioners, Association of American Railroads, Florida Phosphate Council, Inc., Intervenors.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION, and United States of America, Respondents,**

Wheeling-Pittsburgh Steel Corporation, C & O Railroad, CF Industries, Inc., Association of American Railroads, Florida Phosphate Council, Inc., Intervenors.

Nos. 82–3122, 82–3361.

United States Court of Appeals, Third Circuit.

Argued April 25, 1983.

Reassigned July 20, 1983.

Decided Dec. 21, 1983.

L.C. Major, Jr., Russell R. Sage, Major, Sage & King, Alexandria, Va., for petitioner Wheeling-Pittsburgh Steel Corp.

Daniel B. Harrell, Timm L. Abendroth, Office of Gen. Counsel, I.C.C., Washington, D.C., for respondent I.C.C.

Mark A. Keffer, Public Service Com'n of W.Va., Charleston, W.Va., for petitioner, Public Service Com'n of West Virginia.

John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, Washington, D.C., for respondent U.S.

Charles D. Gray, Nat. Ass'n of Regulatory Utility Com'rs, Washington, D.C., for intervenor Nat. Ass'n of Regulatory Utility Com'rs.

Renee D. Rysdahl, John J. Paylor, Chesapeake and Ohio Ry. Co., Cleveland, Ohio, R. Eden Martin, David M. Levy, Sidley & Austin, Washington, D.C., for intervenor Chesapeake and Ohio Ry. Co.

Martha W. Barnett, Janet R. Studley, Holland & Knight, Tallahassee, Fla., for intervenor Florida Phosphate Council.

Betty Jo Christian, Stephen Ailes, Steven A. Brigance, Steptoe & Johnson, Chartered, Washington, D.C., for intervenor Ass'n of American Railroads.

Before ADAMS and HIGGINBOTHAM, Circuit Judges, and STAPLETON, District Judge.[*]

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The extent to which intrastate rail shipments must contribute to the income of an interstate rail carrier is a complex issue confronting state and federal regulators with increasing frequency. In these proceedings we are asked to decide whether rates approved by federal and state regulators for intrastate shipments of the Chesapeake & Ohio Railroad (C & O) comply with federal standards. To resolve this issue, we must construe several provisions of the Staggers Rail Act of 1980[1] governing the adequacy of railroad revenues and the Interstate Commerce Commission's most recent standards implementing that Act.[2]

## I.

The Wheeling-Pittsburgh Steel Corporation (W–P) operates a coke plant in Follansbee, West Virginia, which in 1980 received 1.86 million tons of coal used to produce steel ("metallurgical coal") from two mines in Omar and Beckley, West Virginia. Coal from these mines moved by open hopper car to Huntington and Ceredo, West Virginia, where it was transshipped by barge to Follansbee. Because the ultimate destination of the coal shipments was in West Virginia, these shipments were part of the intrastate transportation of coal.[3] All coal from Omar and Beckley was transported by the C & O.

Until August, 1981, the C & O tariff prescribing rates for the transportation of coal to Huntington and Ceredo provided for four groups of rates based on the distance between mines in Kentucky and West Virginia and the ports at Huntington and Ceredo. Omar is in rate group A; Beckley, in group C. Within each group, rates varied with the type of coal as well as with its characterization as an interstate or intrastate shipment. C & O charged a lower rate for metallurgical coal than for coal used to generate electricity ("steam coal") and a lower rate for coal destined to remain in West Virginia ("intrastate coal") than for coal destined for points outside West Virginia ("interstate coal"). The former rates for groups A and C are indicated in the following table.

| GROUP A | Coal from Omar | |
|---|---|---|
| Interstate steam coal | | $5.58 |
| Interstate metallurgical coal | | 5.10 |
| Intrastate steam coal | | 4.27 |
| Intrastate metallurgical coal | | 3.86 |

| GROUP C | Coal from Beckley | |
|---|---|---|
| Interstate steam coal | | $6.97 |
| Interstate metallurgical coal | | 6.44 |
| Intrastate steam coal | | 5.49 |
| Intrastate metallurgical coal | | 5.04 |

---

[*] Hon. Walter K. Stapleton, United States District Court for the District of Delaware, sitting by designation.

[1] Pub.L. No. 96–448, 94 Stat. 1895.

[2] Ex parte No. 347 (Sub-No. 1), Coal Rate Guidelines—Nationwide, —— I.C.C. —— (Feb. 8, 1983).

[3] See Texas & N.O.R.R. v. Sabine Tram Co., 227 U.S. 111, 123–30, 33 S.Ct. 229, 233–36, 57 L.Ed. 442 (1913); Railroad Comm'n of Ohio v. Worthington, 225 U.S. 101, 108–10, 32 S.Ct. 653, 655–56, 56 L.Ed. 1004 (1912).

On August 21, 1981, C & O filed a revised tariff with the West Virginia Public Service Commission (PSC). Under the new tariff, the distinction between metallurgical coal and steam coal and between intrastate coal and interstate coal was abolished and the rate structure was significantly changed. The pertinent portions of the August 21 tariff are as follows:

| GROUP A | Coal from Omar | $5.58 |
| GROUP C | Coal from Beckley | 6.97 |

As these schedules indicate, the August 21 tariff simply replaced the four rates within each rate group with a single rate equal to the highest former price. As a consequence, rates for shipments from Omar to Follansbee increased from $3.86 to $5.58, or 45 percent per ton. Rates for shipments from Beckley to Follansbee increased from $5.04 to $6.97, or 38 percent per ton. Because C & O had instituted earlier rate increases between October 1, 1980 and July 1, 1981,[4] the August 21 tariff represented rate increases in less than a year of 92 percent for Omar and 84 percent for Beckley.

**4.** The C & O tariff applicable prior to October 1, 1980 prescribed rates of $2.91 and $3.79 for intrastate shipment of metallurgical coal from Omar and Beckley, respectively. Between October 1, 1980 and July 1, 1981, C & O implemented six rate increases pertaining to fuel surcharges, cost recovery increases, and general rate adjustments. These rate increases were authorized by section 214(b)(6) of the Staggers Act, 49 U.S.C. § 11501(b)(6) (Supp. V 1981), prohibiting any state from exercising jurisdiction over general rate increases, inflation-based rate increases, and fuel adjustment surcharges approved by the Commission.

**5.** National Steel Corp., Amherst Coal Co., and the Eastern Coal Transportation Conference also protested the August 21 tariff. National Steel later negotiated a "mutually satisfactory compromise" rate contract with C & O as authorized by section 208(a) of the Act, 49 U.S.C. § 10713 (Supp. V 1981), and withdrew its protest. Amherst Coal and the Eastern Coal Transportation Conference withdrew their protests on December 1 and November 16 respectively.

**6.** "Market dominance" is the "absence of effective competition from other carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C. § 10709(a) (Supp. V 1981).

W–P and three other protestants [5] petitioned the PSC for review of the C & O tariff. Evidence received by a PSC hearing examiner in December, 1981 indicated that C & O had "market dominance" over shipments governed by the tariff [6] and, hence, that rates prescribed by the C & O tariff must be "reasonable." *See* 49 U.S.C. § 10701a(b)(1) (Supp. V 1981).

In order to evaluate the reasonableness of C & O's rates, the hearing examiner determined the variable costs of shipments governed by the August 21 tariff by making two adjustments to the cost calculations contained in Rail Form A (RFA) filed by C & O with the Interstate Commerce Commission.[7] The first alteration, known as the *Ex parte 270* adjustments, modified variable costs listed in the RFA to account for economies of multiple-car movements.[8] The second modification further refined the cost calculation to account for particular characteristics of the C & O shipments, only two of which are relevant here: "origin switching costs" [9] and "crew costs." [10] After mak-

**7.** "Variable costs" are the direct costs of labor and material incurred for each unit of coal transported. *See* Ex parte No. 347, Coal Rate Guidelines—Nationwide, 364 I.C.C. 360, 364 (1980); *Atchison, T. & S.F. Ry. v. United States,* 606 F.2d 442, 446 (4th Cir.1979). Rail Form A is used to calculate the average cost of an average railroad car in conventional service. *See San Antonio, Tex. v. United States,* 631 F.2d 831, 835 n. 9 (D.C.Cir.1980). The form does not, however, allow for the calculation of the costs of particular shipments of coal. For this purpose certain adjustments to the RFA must be made.

**8.** *See* Ex parte 270 (Sub-No. 4), Investigation of Railroad Freight Rate Structure—Coal, 345 I.C.C. 71 (1974). The *Ex parte 270* adjustments reduce switching costs per carload by 75 percent at origin and destination, reduce variable costs per carload by 50 percent at origin and destination, and reduce station clerical costs per carload.

**9.** "Origin switching costs" are incurred when empty railroad cars are exchanged for fully loaded cars at the mine. W–P contended, and the hearing examiner agreed, that the *Ex parte 270* adjustments overstated origin switching

**10.** See note 10 on page 350.

ing these alterations, the examiner established variable costs for shipments from Omar and Beckley to Huntington and Ceredo and computed the ratio of revenues (represented by the August 21 tariff rates) to these variable costs, yielding the following table:

| Shipment | Variable cost/ton | Revenue/ variable cost |
|---|---|---|
| Omar to Huntington | $1.817 | 307.10% |
| Omar to Ceredo | 1.898 | 293.99 |
| Beckley to Ceredo | 2.951 | 236.19 |

The hearing examiner evaluated the reasonableness of C & O's rates by comparing these rates with the variable costs reported in the foregoing table and determined that a maximum reasonable revenue-to-variable cost ratio would be 175%. As the preceding table indicates, the ratios of revenues to variable costs under the August 21 tariff greatly exceeded this figure. Accordingly, the examiner found the rates provided in the new tariff unreasonable. The examiner observed that the rates already in effect for Rate Group A prior to August 21 exceeded the maximum reasonable level of 175 percent. He nevertheless authorized the continued application of the former Group A rate and calculated a new rate for Group C:

| Group A | Coal from Omar | $3.86 |
|---|---|---|
| Group C | Coal from Beckley | 5.16 |

On February 10, 1982, the PSC adopted the examiner's recommendations as a final order, declaring that it would not "reverse or modify a recommended decision unless the decision is contrary to the evidence, unsupported by the evidence, is arbitrary, based upon a mistake of law, or based upon

costs. The hearing examiner replaced the *Ex parte 270* figures with what he believed were "system average costs" costs based on the 1980 C & O RFA as recalculated by W–P. These figures were in fact not "system average costs" at all, but rather costs based on a time study conducted by Gerald Fauth, an expert employed by W–P, which the examiner himself had rejected as unreliable. The parties agree that the examiner committed this error, but dispute its significance. *See* W–P Br. at 40 n. 21; ICC Br. at 38.

10. "Crew costs" are the wages paid to C & O train crews while serving the Omar and Beck-

a misapplication of legal principles." The PSC directed that C & O refund the portion of the increased rate found to be unreasonable.

On February 16, C & O petitioned the ICC to review this order of the PSC under section 214(b) of the Staggers Act, 49 U.S.C. § 11501(c) (Supp. V 1981), arguing that the "standards and procedures" employed by the PSC were not in accord with the provisions of the Interstate Commerce Act. *See* 49 U.S.C. § 11501(c) (Supp. V 1981). The ICC set aside the February 10 order of the PSC as "inconsistent with Federal law in certain critical respects":

(1) The order of the PSC did "not show that sufficient consideration was given to revenue adequacy," noting that the PSC did not explain "how its prescribed maximum reasonable revenue/variable cost ratio of 175 percent would contribute to petitioner's revenue adequacy." Interstate Commerce Commission, Decision No. 38793 (Mar. 17, 1982). The Commission added that "[s]ome explanation is especially appropriate here, since there is reason to question whether a prescribed maximum reasonable rate at 10 percent above the present jurisdictional threshold level [of 165 percent] would make an effective contribution toward revenue adequacy." [11]

(2) The order "lack[ed] a rationale for establishing a revenue/variable cost ratio of 175 percent." The Commission held that to be consistent with the Staggers Rail Act "the PSC must fully explain the methods and policies by which it develops its maximum rate standards."

ley mines. The examiner apparently did not modify crew costs.

11. At the time of the Commission's order, the Staggers Act required a finding that carriers with revenue/variable cost ratios below 165 percent did not have market dominance. *See* 49 U.S.C. § 10709(d)(2)(B) (Supp. V 1981); note 6 *supra*. A finding by the Commission that a rate equals or exceeds this percentage does not establish a presumption that a proposed rate exceeds or does not exceed a reasonable maximum. 49 U.S.C. § 10709(d)(4) (Supp. V 1981).

(3) The order "fail[ed] to allow [the ICC] to review its analysis of basic costing matters," precluding a "verification of the methodology used by the state in resolving cost issues or reconstructing costs with any degree of accuracy." Particularly disturbing to the Commission were adjustments by the PSC to "crew costs" and "switching origin costs." The "true variable costs," the Commission found, "are indeterminate."

Because section 214(b) requires that the ICC establish appropriate rates whenever state standards and procedures do not comport with federal standards, 49 U.S.C. § 11501(c) (Supp. V 1981), the Commission adopted the rates instituted by C & O in the August 21 tariff as the "appropriate rates at this time." The Commission's approval of C & O's rates rests on the following analysis:

> Balancing the goals reflected in the statute, with special attention to [49 U.S.C.] § 11501 and its history, the evidence before us, and practical considerations, we determine that the rates for Group A and C origins, as set forth in [the August 21 tariff], are the appropriate rates at this time, and we will authorize their continued application to this traffic.

W–P petitioned this court for review of the ICC's order. Another petition for review subsequently filed by the PSC in the Fourth Circuit was transferred to this court. We have jurisdiction under 28 U.S.C. § 2321(a) (1976) and 28 U.S.C. § 2342 (Supp. V 1981).

## II

These petitions raise three issues for our consideration. The ICC and intervenors, C & O, Association of American Railroads, and Florida Phosphate Council, maintain that the February 10 order of the PSC does not comply with federal "standards and procedures" within the meaning of 49 U.S.C. § 11501(c) (Supp. V 1981). W–P, the PSC, and intervenor National Association of Regulatory Utility Commissioners (NA-RUC) maintain that in making this finding, the ICC has exceeded the scope of its review under section 11501(c).

W–P and NARUC also challenge that portion of the March 17 order of the ICC declaring C & O's August 21 tariff "the appropriate rates at this time" as without adequate foundation under the Administrative Procedure Act. The ICC contends that its order was adequate given the 30-day period within which the Staggers Act obliges the ICC to act. *See* 49 U.S.C. § 11501(c) (Supp. V 1981).

Finally, the parties disagree as to the standard we should use in receiving ICC orders. W–P maintains that the ICC's justification for preempting an order of a state authority must meet "a high standard of certainty" and must "clearly appear." The ICC contends that a Supreme Court holding to this effect is no longer controlling because of the fundamental reallocation of federal and state ratemaking authority worked by the Staggers Act.

## A.

Section 10(e) of the Administrative Procedure Act (APA) provides that when a court reviews agency action, it shall set aside findings and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2) (1976). In the year preceding the enactment of the APA, the Supreme Court subjected ICC orders to a standard of review somewhat more rigorous than that subsequently applicable under section 10(e) of the APA. Construing a predecessor to section 11501(c), the Court held:

> Intrastate transportation is primarily the concern of the state. The power of the Interstate Commerce Commission with reference to such intrastate rates is dominant only so far as necessary to alter rates which injuriously affect interstate transportation.... A scrupulous regard for maintaining the power of the state in this field has caused this Court to require that Interstate Commerce Commission orders giving precedence to federal rates must meet "a high standard of certain-

ty." . . . Before the Commission can nullify a state rate, justification for the "exercise of federal power must clearly appear."

*North Carolina v. United States,* 325 U.S. 507, 511, 65 S.Ct. 1260, 1263, 89 L.Ed. 1760 (1945) (citations omitted).

At issue in *North Carolina* was former section 13(4) of the Interstate Commerce Act, which authorized the ICC to remove unreasonable discriminations against interstate commerce caused by low intrastate rates.[12] The history of section 13(4) reveals a scrupulous regard on the part of Congress for state regulatory authority over intrastate rates.[13] In conformity with this longstanding deference to state expertise over intrastate rates, the Supreme Court required that the ICC establish more than mere price discrimination before preempting a state ratemaking order as an unreasonable burden on or discrimination against interstate commerce. The ICC must establish that the state rate was "not contributing its fair share of the revenue required to enable [the carrier] to render adequate and efficient transportation service."

*North Carolina, supra,* 325 U.S. at 514, 519–20, 65 S.Ct. at 1264, 1267.[14]

Section 214(b) of the Staggers Act of 1980, codified at section 11501(a) of the Interstate Commerce Act, carries forward the authority under section 13(4) to proscribe intrastate rates that discriminate against or impose an undue burden on interstate or foreign commerce. Section 11501(b), however, adds a new requirement to section 13(4): the states may regulate intrastate rates only in accordance with the standards and procedures of the Interstate Commerce Act. Consequently, section 11501(b) expanded the authority of the ICC over intrastate ratemaking. The Commission may now establish an intrastate rate without first finding an undue burden on or unreasonable discrimination against interstate commerce, provided that the Commission finds that the state rate is not consistent with federal standards or procedures.

Section 11501(b) represented a compromise between those favoring federal preemption of state authority over intrastate ratemaking and those advocating continuing state control over intrastate rates. As introduced in the House of Representatives,

---

**12.** Transportation Act of 1920, ch. 91, § 416, 41 Stat. 456, 484 (formerly codified at 49 U.S.C. § 13(4), now codified as amended at 49 U.S.C. § 11501(a) (Supp. V 1981)).

**13.** The Cullom Act of 1887 did not apply to the transportation of goods "wholly within one state." Ch. 104, § 1, 24 Stat. 379. In 1906 Congress first authorized the ICC to prescribe just and reasonable rates, but did not expressly authorize the Commission to modify a low intrastate rate found to discriminate against interstate commerce. *See* The Hepburn Act of 1906, ch. 3591, 34 Stat. 584, 589. The Mann-Elkins Act of 1910, ch. 309, 36 Stat. 539, continued this congressional policy. Not until the Supreme Court held in the *Shreveport* case, *Houston E. & W. Tex. Ry. v. United States,* 234 U.S. 342, 355–60, 34 S.Ct. 833, 838–39, 58 L.Ed. 1341 (1914), that the anti-discrimination provisions of section 3 of the Cullom Act permitted the Commission to require that a discriminatory intrastate rate be rescinded, did Congress expressly empower the ICC to exercise jurisdiction over intrastate ratemaking. *See* Transportation Act of 1920, ch. 91, § 416, 41 Stat. 456, 484. A 1958 amendment to section 13(4) authorized the Commission to correct "undue burdens" on interstate or foreign commerce as well as undue preferences and discriminations. Transportation Act of 1958, Pub.L. No. 85–625, § 4, 72 Stat. 568, 570–71. At no time during this period, however, did Congress authorize the ICC to exercise jurisdiction over intrastate rates without having explicitly found a burden on, or discrimination against, interstate commerce.

**14.** In subsequent cases, all involving rates prescribed by the Commission after a full hearing, the Supreme Court required specific findings by the Commission to the effect that intrastate rates "are abnormally low and are not contributing their fair share to" revenues and that proposed increases "will constitute not more than a fair proportion of [the railroads'] total income." *King v. United States,* 344 U.S. 254, 275, 73 S.Ct. 259, 270, 97 L.Ed. 301 (1952). The Court found fatal the failure to consider particular shipments "in light of the carrier's other intrastate revenues," *Chicago, M., St. P. & P.R. Co. v. Illinois,* 355 U.S. 300, 308, 78 S.Ct. 304, 309, 2 L.Ed.2d 292 (1958), and the failure to establish "that all material factors bearing on the reasonableness of rates were substantially the same." *Public Service Comm'n v. United States,* 356 U.S. 421, 428, 78 S.Ct. 796, 800, 2 L.Ed.2d 886 (1958).

the predecessor to section 11501(b) would have divested the states of all authority over rates under the Commission's jurisdiction.[15] Criticism of this provision by a number of state public service commissions led Congressman Broyhill to propose an amendment to the House bill preserving state jurisdiction over intrastate rates, subject to the condition that state regulatory authorities apply federal substantive rules and certify that their procedures are compatible with federal procedures.[16] With only minor modification, this amendment became section 11501(b).

Contrary to the ICC's contention, the legislative history of the Staggers Act indicates that the Act did not fundamentally reallocate federal and state ratemaking authority. Neither the Act nor its legislative history indicates any intention to overrule the Supreme Court's holding in *North Carolina* or to limit its application to challenges under section 11501(a). Rather, it appears that Congress, by rejecting federal preemption of intrastate rates, intended to preserve this traditional sphere of state competence. It follows, then, that the ICC must, in exercising its authority under section 11501(b) to preempt state rates for nonconformity with federal standards or procedures, make the basis for its preemption order clear. This is essential if state regulatory authorities are to fulfill the obligation vested in them by Congress to regulate intrastate rates in accordance with federal standards. Moreover, this conclusion is a corollary of the traditional precept of administrative law that meaningful judicial review of agency action is not possible without an explanation of the grounds for an administrative decision. *See, e.g., Atchinson, T. & S.F.R. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 807, 93 S.Ct. 2367, 2374, 37 L.Ed.2d 350 (1973); *Permian Basin Area Rate Cases,* 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968).

**B.**

In holding that the February 20 order of the PSC did not adhere to federal standards and procedures, the ICC, W–P insists, exceeded the scope of its review under section 11501(c). The plain language of that section indicates that the phrase "standards and procedures" incorporates the express provision of the Interstate Commerce Act.[17] Standards under the Act, however, are general in nature. Section 10701a, for example, requires that the rates established for carriers with market dominance be "reasonable," while subsection 10701a(b)(3) enjoins the Commission, in evaluating the reasonableness of railroad rates, to recognize the policy that rail carriers earn "adequate revenues."

W–P maintains that this generality affords state regulatory authorities a certain latitude in assessing the reasonableness and adequacy of intrastate rates. The PSC argues, for example, that state authorities are free to exercise their judgment as to whether revenue levels are reasonable and contribute adequately to a carrier's income. Both W–P and the PSC assert that federal standards and procedures are limited to those stated in the Act. Because the Act does not expressly prescribe formulae for determining maximum reasonable rates or the extent to which intrastate shipments must contribute to revenue adequacy, Congress evidently left these determinations to the discretion of state authorities.

We cannot agree that Congress intended that state regulatory authorities exercise a measure of discretion in the interpretation of federal standards and procedures under the Act. Two arguments inform our view. First, we do not believe that this interpretation is consonant with the legislative history of the Staggers Act. The Conference Com-

---

**15.** *See* H.R. 7235, 96th Cong., 2d Sess. § 210(b) (1980), *reprinted in* H.Rep. No. 1035, 96th Cong., 2d Sess. 1, 9 (1980), U.S.Code Cong. & Admin.News 1980, 3978.

**16.** *See* 126 Cong.Rec. H6015–16 (daily ed. July 2, 1980).

**17.** Congress recodified the Interstate Commerce Act without substantive change as subtitle IV of title 49. See Revised Interstate Commerce Act, Pub.L. No. 95–473, 92 Stat. 1337 (1978). The reference in section 11501(c) to "this subtitle" is to subtitle IV.

mittee Report recites the conferees' intent "to ensure that the price and service flexibility and revenue adequacy goals of the Act are not undermined by state regulation of rates, practices etc., which are not in accordance with these goals." [18] These goals would plainly be at peril were state compliance to be judged under an abuse of discretion standard.

Second, the Act itself obliges the Commission to develop federal standards and procedures for both variable costs and revenue adequacy. 49 U.S.C. §§ 10701a(c)(4)(A), 10704(a)(2) (Supp. V 1981). Little would be served were the states free to pursue their own interpretations of the Act apart from the standards and procedures promulgated by the Commission. To the contrary, the consistency between federal and state standards sought by the drafters of the Act would be undermined by such an interpretation. It seems evident, therefore, that Congress intended the term "standards and procedures" to encompass standards and procedures promulgated and interpreted by decisions of the ICC. The Commission's standard for reviewing the standards it promulgates must be binding on the states; in no other fashion could the Commission ensure that state authorities act in conformity with federal rules.

Despite the language and legislative history of the Staggers Act, the PSC suggests that Congress contemplated only a "quick check" on state rulemaking by the ICC. Section 11501 gives the Commission 30 days to certify state standards and procedures. Therefore, the PSC contends, the Staggers Act must envision a limited review to ensure that the standards approved by the Commission under section 11501 are actually applied.

We find this argument unpersuasive. The legislative history reveals that the 30 day review period is a congressional response to Commission delays in approving intrastate railroad rate increases.[19] Nothing in the legislative history suggests that the abbreviated period was intended to sanction limited review of state orders setting intrastate rates. Section 11501(c) does not leave state authorities free to exercise their judgment as to whether the Commission's standards have been satisfied. Rather, the Commission's scope of review must be plenary with respect to the standards it approves under section 11501(b).[20]

■ We hold that the phrase "standards and procedures" in section 11501(c) refers to standards and procedures promulgated and interpreted in decisions and orders of the ICC as well as those standards or procedures expressly incorporated in the

---

18. H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 106, *reprinted in* 1980 U.S.Code Cong. & Ad. News 3978, 4110, 4138; H.Rep. No. 1035, 96th Cong., 2d Sess. 61, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4006.

19. Both the Staggers Act and the Railroad Revitalization and Reform Act of 1976 ("4R Act") addressed regulatory delay in Commission proceedings. *See* S.Rep. No. 499, 94th Cong., 2d Sess. 15, *reprinted in* 1976 U.S.Code Cong. & Ad.News 14, 29. Section 303 of the 4R Act imposed rigorous timetables on Commission hearings. Pub.L. No. 94–210, § 303, 90 Stat. 31, 48 (codified at 49 U.S.C. § 10327 (Supp. V 1981)). Section 207 of the Staggers Act imposed even more rigorous schedules on Commission hearings to review rail rates, including a reduction from seven to five months in the period for Commission review. Pub.L. No. 96–448, § 207(a), 94 Stat. 1895, 1907 (codified at 49 U.S.C. § 10707(b)(1) (Supp. V 1981)). State authorities are required, by virtue of their obli-

gation to conform to federal "procedures," to adhere to this five-month deadline. The purpose of the House bill's preemption of state ratemaking authority was to protect against declines in railroad income during the pendency of state proceedings. *See* H.Rep. No. 1035, 96th Cong., 2d Sess. 61, *reprinted in* 1980 U.S. Code Cong. & Ad.News 3978, 4006. The 30-day period of section 11501(c) was part of a compromise solution to this problem of regulatory delay.

20. W–P maintains that the ICC may not review the orders of state authorities under the "arbitrary or capricious" standard, observing that section 11501(c) does not expressly authorize that standard of review. This position is without merit. Orders of the Commission must satisfy the arbitrary or capricious standard of review in section 10(e) of the APA, 5 U.S.C. § 706(2)(A) (1976). State authorities are thereby obliged to adhere to this standard by 49 U.S.C. § 11501(b) (Supp. V 1981).

Interstate Commerce Act. On questions of law as to whether state authorities have complied with these standards or procedures, the Commission's review is plenary.

### C.

█ On February 8, 1983, the ICC promulgated revised standards for maximum reasonable rates under the Staggers Act. *See Ex parte 347* (Sub-No. 1), *Coal Rate Guidelines—Nationwide* (Feb. 8, 1983). As guidelines promulgated under the Act, these are federal "standards" within the meaning of section 11501(c). In an extensive discussion of revenue adequacy and maximum reasonable rates, the Commission approved a system of "constrained market pricing." Under the Commission's guidelines,

> railroad pricing of market dominant coal traffic would be subject to four upward constraints: (1) the cost of serving that traffic without regard to any other traffic ("stand-alone cost"); (2) certain checks on obviously inefficient management; (3) achievement of revenue adequacy; and (4) phasing of any substantial rate increases.

*Ex parte 347, supra,* slip op. at 10.

Two of the guidelines are particularly pertinent to these proceedings. The definition of "stand-alone cost" requires that the Commission derive "the minimum long-run average cost for the optimal capacity for the stand-alone shipper." *Id.* at 12. Guide-

lines for determining stand-alone cost are provided in an Appendix and permit the use of "system average costs" for the computation of certain costs, such as crew wages, but not for major capital investments such as rails, ties, and locomotives. *Id.;* App. A, at 1. The guidelines also propose to phase in rate increases in increments of no more than 15 percent per year. This cap on annual rate increases excludes inflation-based increases, *see* note 4 *supra,* but includes all other increases authorized by the Act.[21]

The Commission's most recent opinion in *Ex parte 347,* issued after the entry of its order in this case, but before our disposition of these petitions, represents those federal standards for maximum reasonable rates and revenue adequacy now in force. It is a well established principle that a court should apply the law in effect at the time it renders its decision unless a prospective application is necessary "to prevent manifest injustice." *Bradley v. Richmond School Board,* 416 U.S. 696, 716–17, 721, 94 S.Ct. 2006, 2018–19, 2021, 40 L.Ed.2d 476 (1974). This rule is applicable whether a change in law is made by statute or "by an administrative agency acting pursuant to legislative authorization." *Thorpe v. Housing Authority of the City of Durham,* 393 U.S. 268, 282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474 (1969). We perceive no manifest injustice in applying the new and simpler *Ex parte 347* standards to the case before us.[22]

---

**21.** A third guideline on revenue adequacy states that "if the other constraints described above are in force, the rate that a carrier charges its captive customers is not unreasonably high when the carrier's overall revenues are less than the revenue adequacy level." *Ex parte 347, supra,* slip op. at 14–15. It is conceded that C & O revenues are less than the revenue adequacy level. *See* Ex parte 416, Railroad Revenue Adequacy—1980 Determination, 365 I.C.C. 285 (1981).

**22.** Until the Commission's most recent endeavor to define maximum reasonable rates, the Commission approved in principle the concept of "differential pricing." *See* Arkansas Power & Light Co., 365 I.C.C. 983, 993–94 (1982); Ex parte 347 (Sub.-No. 1), Coal Rate Guidelines—Nationwide (December 16, 1981). Differential pricing relied on the computation of "fully allo-

cated costs," a value obtained by adding to variable costs weighted portions of fixed costs, including an allowance for the current cost of capital. *See San Antonio, Tex. v. United States,* 631 F.2d 831, 835 n. 9 (D.C.Cir.1980); Rules to Govern the Assembling and Presenting of Cost Evidence, 337 I.C.C. 298, 308 (1970). If C & O were to earn revenues on all shipments equal to its fully allocated costs, the railroad would earn a rate of return equal to the current cost of capital. In practice, however, the railroad cannot set all rates at the level of fully allocated costs: competition in some markets drives prices below these levels. Consequently, the railroad must establish rates in non-competitive markets above the level of fully allocated costs in order to earn a rate of return equal to the cost of capital. This practice is known as "differential pricing." Although the practice of differential pricing met with approv-

Because the PSC did not have the benefit of the *Ex parte 347* standards, its February 10 order does not meet the federal standards now in effect for calculating costs or computing maximum reasonable rates. The hearing examiner's computation of costs does not conform to the rules of Appendix A, and the rates authorized by the PSC do not adhere to the 15 percent phase-in rule now applied by the Commission. Accordingly, we will enforce that portion of the Commission's March 17 order holding that rates approved for intrastate shipments by C & O do not match the federal standards.

D.

■ In addition to its action setting aside PSC rates as not complying with federal standards, the ICC prescribed rates proposed by C & O's August 21 tariff as "the appropriate rates at this time." These rates represented increases of 38 and 45 percent, exclusive of inflation-based cost increases, over the rates applicable one year earlier.

We must decline to enforce this portion of the ICC's order on two grounds. First, it

is at odds with the ICC's present standard for phasing in rate increases at 15 percent per year. Second, the ICC order is deficient in that quantum of reason and explanation necessary for judicial review of administrative action. We have held that an order of the ICC setting aside intrastate rates must set forth clearly those federal standards or procedures at issue in the decision and the manner in which a state authority does not conform to them. This the March 17 order does not do.

The order is deficient in at least two respects. First, the decision of the ICC neither articulates a standard for "appropriate rates," nor refers to any other standard previously promulgated. Consequently, nothing in the ICC's decision permits a reviewing court to evaluate the rates set forth in the C & O tariff.[23] Second, the decision does not enumerate those standards particularly applicable to proceedings under section 11501(c). For example, the parties now dispute whether the standards of the Long-Cannon amendment to the Staggers Act, 49 U.S.C. § 10707a(e)(2)(C) (Supp. V 1981), apply to section 11501(c) proceedings.[24] Without some explanation of how or whether the Commission is apply-

al in the courts, *see Burlington Northern, Inc. v. United States,* 661 F.2d 964, 974 (D.C.Cir.1981); *San Antonio, Tex., supra,* 631 F.2d at 835; *Houston Lighting & Power Co. v. United States,* 606 F.2d 1131, 1148 (D.C.Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980), the Commission struggled to develop a formula for its implementation. The Commission's most recent *Ex parte 347* standards represent a simplified approach to differential pricing based on the concept of "stand-alone cost." Because these rules are clearer and less arbitrary than prior efforts to implement a system of differential pricing, we believe that their application is appropriate in this case.

**23.** The ICC observes that C & O's August 21 tariff increased intrastate rates to interstate levels and argues that "it was reasonable for the Commission to find intrastate rates at that same level to be appropriate." Br. at 40. We cannot agree. First, the C & O tariff equated intrastate and interstate rates and established their joint level at the highest former level for interstate rates. While it is plausible that a joint value for interstate and intrastate rates is reasonable, nothing suggests that it was reasonable to establish this joint value at the highest former interstate rate. Second, nowhere

does the ICC's decision recite that C & O's intrastate rates were reasonable because they were equal to C & O's interstate rates. This is instead a *post hoc* justification of appellate counsel. We are obliged, however, to review the ICC order "on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168–69, 83 S.Ct. 239, 245–46, 9 L.Ed.2d 207 (1962).

**24.** Section 10707a(e)(2)(C) requires that the ICC consider a variety of data at the carriers' disposal before finding a rate increase to be reasonable. In Arkansas Power & Light Co., 365 I.C.C. 983 (1982), the Commission construed this section as requiring consideration of the "Long-Cannon" factors in all cases, with the party bearing the burden of proof also bearing the burden of coming "forward with evidence relevant to the factors." 365 I.C.C. at 994–97. Although C & O bears the burden of proof in this case, C & O did not come forward with evidence respecting the Long-Cannon factors and the ICC did not consider them. The Commission decided *Arkansas Power* on September 3, 1982, after its order of March 17 and before the entry of its order denying WP's petition for review on September 16. The ICC

ing the Long-Cannon standards to section 11501(c) proceedings, we are unable to assess the Commission's order against these standards.[25]

The Commission argues that the 30-day review period of section 11501(c) justifies the scant reasoning in its March 17 order. "It would have been wholly impractical for the Commission to have constructed a new rate within the time limits imposed." Br. at 41. Instead, the ICC maintains, W–P should repair to a second challenge before state authorities. In such a proceeding, "different time constraints would apply, [and] a more complete determination could be made under less pressured circumstances." Id. at 43.

We cannot agree with this conclusion. First, the ICC's inability to proceed within the 30-day period mandated by Congress is apparently attributable to its failure to articulate clear federal standards for section 11501(c) proceedings. Second, any deficiency in the period permitted for review should be brought to the attention of Congress, which required ICC review of state orders within 30 days. We cannot ascribe to Congress the intention that this brief period authorizes the ICC to issue orders lacking in reasoned explanation. Moreover, the second proceeding before the PSC, which the ICC commends to W–P, would also be subject to the same 30-day ICC review period.

Accordingly, we will decline to enforce that portion of the ICC's order establishing

rates proposed by C & O in its August 21 tariff as "the appropriate rates at this time."[26]

## III.

In sum, we will enforce that portion of the Commission's order setting aside the February 10 order of the PSC, deny enforcement to that portion of the Commission's order establishing the rates identified in C & O's August 21 tariff, and remand for proceedings consistent with this opinion.[27]

---

now asserts that "Congress clearly did not expect the ICC to gather and evaluate such a vast amount of additional evidence in the 30 days alloted in section 11501(c)." Br. at 42.

**25.** Petitioners maintain that the ICC order is invalid on two additional grounds: (1) that the ICC relied on an impermissible presumption based on the 165 percent revenue/variable cost percentage, see 49 U.S.C. § 10709(d)(4) (Supp. V 1981); note 11 supra, and (2) that the ICC exceeded its scope of review over evidence respecting costs. We do not agree that the ICC in fact relied on the presumption forbidden by section 10709(d)(4). Moreover, we do not agree that the ICC exceeded its scope of review by requiring that cost information developed by the PSC be sufficiently clear for subsequent evaluation by the ICC.

**26.** We are without power to modify these rates during the pendency of proceedings before the ICC. Burlington Northern, Inc. v. United States, 459 U.S. 131, 103 S.Ct. 514, 74 L.Ed.2d 311 (1982).

**27.** We observe that new cost information required by the Ex parte 347 standards must apparently be developed in the first instance by the trier of fact, here the PSC. We note as well that before the PSC considers such cost evidence, the ICC may wish to articulate standards applicable to section 11501(c) proceedings, particularly whether the Commission will apply the Long-Cannon factors to these proceedings.